UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| AARON S.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:21-cv-00014-SEB-DML |
| | ) | |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security,[2] | ) ) ) | |
| | ) | |
| Defendant. | ) | |

# **ORDER**

Plaintiff Aaron S. ("Aaron") has appealed the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying his May 31, 2018, application for disability insurance benefits ("DIB") and his June 1, 2018, application for supplemental security income ("SSI"), alleging a disability onset date of May 24, 2018. R. (Dkt. 16) at 10. The SSI application was initially denied on September 7, 2018,[3] R. at 143, and the applications were denied upon reconsideration on December 18, 2018. R. at 152; 159. The administrative law judge ("ALJ") conducted a hearing on February 11, 2020, R. at 47, and a supplemental hearing on July 8, 2020. R. at 33. The

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana uses only first names and last initials of non-governmental parties in Social Security judicial review opinions.

[2] According to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi automatically became the Defendant in this case when she was named as the Acting Commissioner of the SSA.

[3] The record does not include the notice of the initial denial of Aaron's DIB claim.

1

ALJ issued a decision on July 28, 2020, that Aaron was not disabled and thus not entitled to receive DIB or SSI. R. at 7; 24. The Appeals Council denied review on November 16, 2020, and the Commissioner's decision became final. R. at 1. On January 20, 2020, Aaron timely filed this civil action seeking judicial review of the decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Dkt. 1.

For the reasons below, the decision of the Commissioner is affirmed.

## **Background**[4]

The ALJ followed the five-step sequential evaluation set forth by the SSA, *see* 20 C.F.R. § 404.1520(a)(4)(i) to (v)[5], in concluding that Aaron was not disabled. R. at 24. Specifically, the ALJ found as follows:

- At Step One, Aaron had not engaged in substantial gainful activity[6] since the alleged onset date, May 24, 2018. R. at 13

- At Step Two, he had "the following severe impairments: lumbar degenerative disc disease, status post fusion; narcolepsy; and a learning impairment." *Id*. (citations omitted).

- At Step Three, he did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. *Id*.

---

[4] The discussion of Aaron's medical history and treatment includes sensitive and otherwise confidential medical information that has been thoroughly detailed in the ALJ's decision and the parties' respective briefs. To the extent possible, we detail here specific facts only as necessary to address the parties' arguments.

[5] The Code of Federal Regulations contains separate, parallel sections concerning DIB and SSI, which are identical in most respects. Generally, a verbatim section exists establishing the same legal point with both types of benefits. *See, e.g.*, 20 C.F.R. § 416.920(a)(4)(i)-(v). We will take care to detail any applicable substantive differences but will not usually reference the parallel section.

[6] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

- After Step Three but before Step Four, Aaron had the residual functional capacity ("RFC") "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: occasional stooping, kneeling, crouching, crawling, and climbing ramps or stairs; no climbing ladders, ropes, or scaffolds; no exposure to extreme heat, extreme cold, humidity, wetness, vibrations, or hazards, such as unprotected heights or dangerous machinery; sitting for thirty to forty-five minutes at a time, for a total of up to six hours in the eight-hour workday; standing for thirty to forty-five minutes at a time, for a total of up to two hours in the eight-hour workday; walking for thirty to forty-five minutes at a time, for a total of up to two hours in the eight-hour workday." R. at 16.

- At Step Four, relying on the testimony of the vocational expert ("VE"), and considering Aaron's RFC, he was incapable of performing any of his past relevant work as an industrial cleaner, welder, gluer, and material handler. R. at 22.

- At Step Five, relying on the VE's testimony and in light of Aaron's age (29 years of age on the alleged onset date), education (at least a high school graduate), RFC, and work experience, there were jobs that existed in significant numbers in the national economy that he could have performed in representative occupations like a document preparer, tube operator, and address clerk. R. at 23.

## Standard of Review

Upon review of the Commissioner's decision,

> [w]e will uphold [it] if it applies the correct legal standard and is supported by substantial evidence. *Castile v. Astrue,* 617 F.3d 923, 926 (7th Cir. 2010). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). A decision denying benefits need not discuss every piece of evidence, but if it lacks an adequate discussion of the issues, it will be remanded. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009). Our review is limited to the reasons articulated by the ALJ in her decision. *Larson v. Astrue,* 615 F.3d 744, 749 (7th Cir. 2010).

*Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). In determining whether the decision was properly supported, we neither reweigh the evidence nor assess the

credibility of witness, nor substitute our judgment for the Commissioner's. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

## Analysis

Aaron contends that the ALJ failed to: (1) support her RFC finding that he would not have been off task because of his narcolepsy, and (2) consider certain limitations that were assessed by the state agency reviewing psychologists. We address these issues in turn below.

### Narcolepsy

Aaron contends that despite the ALJ finding that narcolepsy was one of his severe impairments, she "inexplicably assessed no resultant unscheduled time off task as part of her residual functional capacity [finding] for naps and the general inability to remain focused naturally associated with hyper-somnolence." Dkt. 20 at 11. He also contends that the ALJ impermissibly rejected a relevant, disabling treating source opinion that was consistent with his allegations of excessive tardiness and absences when he last worked. *Id*. He further contends that the ALJ's RFC finding is not supported by the record, and is inconsistent with a statement provided by his last employer. *Id*.

Throughout the decision, the ALJ addressed Aaron's narcolepsy. She explained that he was relatively stable with medication, he did not report any work-related or driving accidents, and he required only annual check-ups with a sleep specialist, Anil Achaen, M.D. R. at 14; 18. She also explained that he was diagnosed as early as 2014, a sleep test had revealed markedly decreased sleep latency with REM sleep in two out of five naps, but he was prescribed and kept on Adderall at the same dosage for at least the

4

last three years of the period under review, with "good result[s]" and "[b]y October 2019, he scored only a 3/24 on the Epworth sleepiness scale when he used medications, compared to a score of 24/24 without medications."[7]  R. at 18 (citation omitted); 20.

According to the new regulatory scheme for claims like Aaron's that were filed on or after March 27, 2017, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s),[8] including those from your medical sources."  20 C.F.R. § 404.1520c(a).  The SSA continues to use factors to evaluate the "persuasiveness of medical opinions and prior administrative medical findings" but the "most important factors" to be considered are "supportability" and "consistency."  *Id*.  How those factors were considered are to be explained in the decision.  *Id*. at 404.1520c(b)(2).  "Supportability" considers the relevance of "the objective medical evidence and supporting explanations presented by a medical source."  *Id*. at 404.1520c(c)(1).  "Consistency" is compared "with the evidence from other medical sources and nonmedical sources in the claim."  *Id*. at 404.1520c(c)(2).  Explicit consideration of the remaining factors is permitted, but not always required,

---

[7] The Epworth sleep scale is based on a patient's self-reported symptoms, and a total score between 0-10 represents the normal range for healthy adults, 11-14 mild sleepiness, 15-17 moderate sleepiness, and 18 and higher severe sleepiness.  Harvard Medical School, Division of Sleep Medicine, https://sleep.hms.harvard.edu/education-training/public-education/sleep-and-health-education-program/sleep-health-education-90 (last visited July 6, 2022).

[8] Administrative medical findings are determinations made by a state agency medical or psychological consultant at the initial or reconsideration level about a claimant's case, "including, but not limited to, the existence and severity of [his] impairment(s), the existence and severity of [his] symptoms, whether [his] impairment(s) meets or medically equals the requirements for any impairment listed in appendix 1 to this subpart, and [his] residual functional capacity." 20 C.F.R. § 404.1513a(a)(1).

except upon a finding that "two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same . . . ." *Id*. at 404.1520c(b)(2)-(3).  The remaining factors comprise such source's: (1) "[r]elationship with the claimant" including the "[l]ength of the treatment relationship," "[f]requency of examinations," "[p]urpose of the treatment relationship," "[e]xtent of the treatment relationship," and "[e]xamining relationship;" (2) "[s]pecialization;" and (3) "[o]ther factors," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements." *Id*. at 404.1520c(c)(3)-(5).

> The ALJ also addressed Dr. Achaen's relevant opinion:
>
> In August 2019, one of the claimant's treating physicians, Dr. Achaen, completed a medical source statement.  In doing so, he explained that he had treated the claimant since November 2014 for a diagnosis of narcolepsy.  He noted that the claimant exhibited symptoms of "sleep attacks" and "excessive daytime sleepiness."  He reported that the claimant would need lifelong treatment to control his symptoms.  He noted that he was currently on Adderall.  Dr. Achaen advised that the claimant's prognosis was fair, as long as he continued in treatment.  Regarding functional limitations, including the need to avoid hazards and take extra breaks, he stated that his limitations depended on how he felt.  He clarified that his sleep attacks could happen without warning.  He opined that he would miss more than four days of work per month based on his symptoms.  Overall, I find that this opinion is not persuasive.  Dr. Achaen has had a longstanding treating relationship with the claimant.  However, he provided an opinion inconsistent with his own treatment notes.  Notably, the claimant has admitted to stability in his condition for at least the past three years; he has denied any accidents while driving or at work.  He has been kept on the same dosage of medication.  Dr. Achaen initially stated that the claimant's prognosis was good with treatment, suggesting that his medication was effective.  However, he then contradicted his statement by

> indicating that the claimant would need to be absent from work four our
> more days per month. Thus, while Dr. Achaen has had a treating
> relationship with the claimant, he ultimately provided an opinion
> inconsistent with the medical evidence in its entirety.

R. at 19 (citations omitted).

The ALJ's reasons for finding Dr. Achaen's opinion unpersuasive are supported by substantial evidence. Impairments that are controlled by medication do not contribute to disability. *See, e.g.*, *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006). The ALJ may also consider any inconsistencies concerning the severity of Aaron's reported symptoms, the frequency of his relevant treatment, the type of treatment including prescribed medications, and his response to such treatment. *See, e.g.*, *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005); *see also Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (noting the deference given to the administrative factfinder on judicial review, as well as the regulatory guidance instructing the ALJ to consider such evidence). In his August 2019 opinion, Dr. Achaen stated that Aaron would have life-long symptoms and would need treatment to control them. R. at 638. But there is substantial evidence that the treatment controlled Aaron's symptoms. Dr. Achaen never needed to adjust Aaron's medication during the period at issue. On October 1, 2019, at the most recent treatment visit with Dr. Achaen, he explained that Aaron had not had "any accidents driving or at work," he had "[n]o significant side effects" from the medication, and his Epworth sleepiness scale was 3/24 with the medication and 24/24 without the medication. R. at 693; *see* note 7. By his own report, Aaron's narcolepsy symptoms did not disrupt his life more than a normal healthy adult.

Aaron testified consistent with what he reported to Dr. Achean during treatment. He testified that he did not have "any issues" with his narcolepsy "if" he took his medication as directed. R. at 76. He further testified that Dr. Achaen's instructions were to take his medication, and he did not need to take any additional precautions unless he forgot. *Id*. When asked if his sleepiness was any different when he was "stressed" or if it was "just always roughly the same," Aaron responded that if he did not take his medication, he "could fall asleep anywhere." R. at 76. But the ALJ followed-up, and Aaron clarified that was only if he did not take his medication. *Id*.

On appeal, Aaron contends that because his testimony was qualified based on whether he took his medication, the ALJ should have considered the limitations that would be reasonably appropriate if Aaron was not taking his medication. *See* Dkt. 20 at 17-18. In his reply, he asserts that the ALJ needed to consider his explanation for any noncompliance with treatment, including the interplay with his mental impairments, before she concluded that noncompliance was an indication of the severity of his impairment. *See* Dkt. 24 at 4 (citing *Kangail v. Barnhart*, 454 F. 3d 627 (7th Cir. 2006). But there is no indication in the medical record that Aaron had any compliance issues with taking his Adderall. He testified that he was able to keep track of his medications and remember to take them. R. at 72. Absent any indication in the record, the ALJ did not rely on noncompliance with treatment to discount the severity of Aaron's symptoms. Rather, she concluded that his medication controlled his symptoms.

On appeal, Aaron contends that there is evidence that he forgot to take his medication as directed because he "testified to frequent tardiness due to narcolepsy in his

8

previous job which was certainly performed with[]in the three-year window prior to the ALJ's decision," his most recent employer provided a statement that he was frequently tardy and absent, he has a learning impairment with a full scale IQ of 66, and he only remembered his tardiness issue when he was prompted during cross-examination by his counsel.  Dkt. 20 at 17-18.

Aaron testified that he missed days or work because of his back pain.  R. at 65. He did not mention ever needing to miss work because of his narcolepsy.  R. at 66.  The ALJ asked if he was ever counseled about performance issues doing his job, and he testified, "No."  R. at 68.  The ALJ asked, "And so, it sounds like the only problems you had in your past work were all related to your back?"  *Id*.  Aaron responded, "Yes."  *Id*. On cross-examination, Aaron testified that during his most employment, he had been late to work "[s]everal times" because of his narcolepsy, he agreed with his counsel that he had forgotten to include narcolepsy as one of the health conditions that affected his most recent employment, he had been "suspended one time for being late or several times for being late," and Dr. Achaen had needed to fill out paperwork for his employer.  R. at 75.

Aaron's most recent employer provided a statement to the SSA about his work performance.  The employer reported that Aaron had been employed full time as a welder from June 22, 2015 through May 17, 2018, but he had been "[t]erminated for poor attendance."  R. at 350.  He had 25 unplanned absences: 12 for personal illness, 3 for a wisdom tooth extraction, 3 because of complications from the extraction, 1 for a flat tire, 1 for a family emergency, 2 because his grandpa was in the hospital, 1 because of his son's surgery, 1 because of a Child Protective Services visit, and 1 because his son had a

doctor appointment. *Id*. He was also tardy 16 times. *Id*. The employer reported that Aaron did not show any signs of trouble maintaining a work routine, he had "no issue" concentrating on his assigned work for the period of time between normal breaks, his health did not necessitate frequent breaks or rest periods, he had the ability to understand and carry out instructions with "no problems," he "completed assigned work with no issues," he had no issues working with others, he did not require additional supervision, he responded appropriately to changes, he did not pose a safety risk, he did not "ask for help any more than any other employee," and his "attendance was [their] only area of concern with him." R. at 350-52.

The ALJ addressed Aaron's employer's statement. She explained that he had been terminated for having 25 unplanned absences, but the "statement still provide[d] excellent information regarding his mental abilities." R. at 20. She also explained that Aaron's ability to maintain work including skilled work as a welder was one indication that his adaptive functioning as an adult exceeded the expectations based solely on his learning impairment. R. at 14-15. The ALJ further explained that the employer statement "noted that the claimant provided a variety of excuses" for his absences, "did not specifically note any problems related to his sleep problems," and "given the variety of his 'excuses,' it can[]not be clearly stated that he was terminated due to absences related to narcolepsy." R. at 21. In fact, there is no evidence that Aaron ever had an unplanned absence from an entire day of work because of his sleep problems.

Aaron testified that he was suspended from work because of tardiness that was caused by his narcolepsy. Neither VE testified directly about the consequences of an

10

individual being late to work or competitive employers' tolerances for instances of tardiness. At the most recent hearing, the VE testified that competitive employers would not tolerate an individual being off task more than five percent of a workday in addition to regular breaks. R. at 41. The crux of Aaron's argument is that the record does not support the ALJ's RFC finding because she did not include any time that he would have been off task. Dkt. 20 at 18. On August 25, 2017, Dr. Achaen noted that Aaron was "late to work sometimes and [he had] given him a letter in the past stating his condition." R. at 429. But there is no indication in the record precisely when that occurred, nor if the issue persisted after Aaron was prescribed Adderall. The August 2017 treatment note also indicated that Aaron had seen improvement with his narcolepsy. *See id.* In each treatment note, Dr. Achaen also repeated the general instructions that he had given Aaron concerning his diagnosis, including regarding "sleep hygiene, "to keep a regular sleep and wake up time every[ ]day and to start taking naps during the day[]time if he [was] very sleepy." *See, e.g.*, R. at 432. However, Aaron testified that he did not remember Dr. Achaen ever telling him to take naps during the daytime. R. at 76. He did not testify to needing to take naps either. And recall, Aaron's employer did not indicate that he had any problems specifically because of sleep problems. His employer explained that he had no problems concentrating between breaks and completing tasks.

The remainder of Aaron's arguments is mere speculation that he was noncompliant with his medication, and that his learning impairment contributed to his noncompliance. The record does not demonstrate either contention, and the ALJ had no duty to infer those contentions. Accordingly, the ALJ did not error by failing to include limitations in her

11

RFC finding that Aaron would either be off task or absent from work because of his narcolepsy.

### **State Agency Psychologists' Assessments**

Aaron contends that the ALJ's Step Five determination is not supported by substantial evidence because she failed to describe all the mental limitations—that were supported by the record—for the VE's consideration. Dkt. 20 at 19. In addition to the limitations supported by Dr. Achaen's opinion—that we discussed in the previous section of this Order, and we concluded that the ALJ properly rejected—Aaron identifies further limitations that were assessed by the state agency reviewing psychologists. Specifically, despite the ALJ finding their assessments persuasive, Aaron contends that the ALJ neglected to include the psychological consultants' assessments that he had: (A) moderate "checkbox" limitations performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; and (B) a limitation responding appropriately to only "brief" supervision and interactions with coworkers. Dkt. 20 at 20.

"As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) (citing *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 619 (7th Cir. 2010); *Indoranto v. Barnhart,* 374 F.3d 470, 473-74 (7th Cir. 2004) (additional citations omitted)). The ALJ's obligation to orient the VE to the totality of a claimant's limitations includes deficiencies of concentration, persistence, and pace. *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018), *as amended on*

12

*reh'g* (Apr. 13, 2018) (quoting *O'Connor-Spinner*, 627 F.3d at 619). The Seventh Circuit has explained "[a]gain and again, . . . that when an ALJ finds there are documented limitations of concentration, persistence, and pace, the hypothetical question presented to the VE must account for th[ose] limitations." *Winsted v. Berryhill*, 923 F.3d 472, 476 (7th Cir. 2019) (collecting cases). "In most cases, . . . employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." *O'Connor-Spinner*, 627 F.3d at 620 (collecting cases). The court explained that "[t]he ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *Id*. (citing SSR 85–15 (S.S.A. 1985), 1985 WL 56857, at *6 ("Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job.")). In *Winsted*, for example, the Seventh Circuit held that the ALJ's RFC finding—and corresponding hypothetic put to the VE in the same terms—that the claimant was limited to "simple, routine, repetitive tasks with few workplace changes, no team[]work, and no interaction with the public" was inadequate because it did not capture his temperamental difficulties completing tasks. 923 F.3d at 476-77.

  To an extent, Aaron implies that the ALJ erred by failing to include "any" mental limitations in her "final" RFC finding. *See* Dkt. 20 at 24. When the ALJ initially announced her RFC finding, she did not detail any mental limitations. *See* R. at 16.

13

However, we read the ALJ's decision as a whole. *See, e.g.*, *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004). She later explained:

> Aside from physical health limitations, I find that the claimant has also had mental limitations. Due to his history of learning deficits, and based on these treatment records and his various mental status examinations of record, I find the claimant has the mental capacity to understand, remember and follow simple instructions, but is restricted to work involving occasional interactions with others and no interaction with the general public.

R. at 21-22. The ALJ put those same mental limitations to the VE, as well as the physical limitations that would ultimately comprise her RFC finding. R. at 37-39. Because the ALJ explained her assessment of Aaron's mental limitations and properly communicated those limitations to the VE, we find that any error based on her failure to include those limitations in the usual place in the written decision is harmless. Accordingly, we turn to Aaron's specific arguments concerning the limitations that were assessed by the state agency psychological consultants.

### Moderate Limitations of Concentration, Persistence, or Maintaining Pace

When assessing the "paragraph B" criteria, the ALJ found that the Aaron had a "moderate limitation" concentrating, persisting, or maintaining pace. R. at 15. The limitations identified in the paragraph B criteria are used to rate the severity of mental impairments at Steps Two and Three of the sequential evaluation process. 20 C.F.R. § 404.1520a(d)-(e). However, the RFC assessment used at Steps Four and Five requires a more detailed assessment by itemizing various functions contained in the broad areas of functioning found in paragraph B of the adult mental disorder listings. Social Security

Ruling ("SSR") 96-8p (S.S.A. July 2, 1996), 1996 WL 374184, at *4. After detailing the mental limitations described above, the ALJ explained:

> Within these parameters, and in the context of performing simple and repetitive tasks, [Aaron] is able to sustain the attention and concentration necessary to carry out work-like tasks with reasonable pace and persistence. While I note a "moderate" limitation in the "paragraph B" criteria above for concentration, persistence or pace, this is based upon the record as a whole and all situations the claimant might encounter. However, when limited as described above, his ability to function is higher. Within these parameters, the claimant is able to sustain the attention, concentration and persistence needed to perform on a regular and continuing basis.

R. at 22.

The ALJ also explained that she found the reviewing psychologists' assessments "highly persuasive" based on the record they reviewed, the limitations that they assessed, and the consistency of their assessments with the totality of the evidence. R. at 18-19. The consultants' verbatim narrative assessments of Aaron's abilities explained:

> The totality of evidence in file suggests that the claimant is able to: understand, carry out and remember simple instructions; able to make judgments commensurate with functions of simple, repetitive tasks; able to respond appropriately to brief supervision and interactions with coworkers and work situations; able to deal with changes in a routine work setting.

*See, e.g.*, R. at 127. The ALJ's RFC finding is consistent with the consultants' narrative assessments that Aaron could carry out simple instructions and perform simple and repetitive tasks in a routine work environment.

In *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021), the court explained that an ALJ may rely on a consultant's narrative assessment if the limitations that the narrative describes are consistent with the consultant's ratings—appearing in "the checklist portion of the [same] form"—of the various functions contained in the broad paragraph B

domains.  The court also explained that moderate limitation is defined by regulation for claims filed on or after January 17, 2017—like Aaron's—to mean that functioning in that area on a sustained basis is fair.  *Id.* at 783 (citing 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(c)).  The court reasoned that "'fair' in ordinary usage does not mean 'bad' or 'inadequate.'"  *Pavlicek*, 994 F.3d at 783.  Here, the psychological consultants found that Aaron was moderately limited with his abilities to understand, remember, and carry out detailed instructions, and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  *See, e.g.*, R. at 126 (the consultants' checklist ratings are the same.)  The consultants assessed him to be not significantly limited with all his remaining vocationally relevant mental abilities including understanding, remembering, and carrying out very short and simple instructions, maintaining attention and concentration for extended periods, completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length and rest periods, as well as any involving social interaction and adaptation.  *See, e.g.*, R. at 126-27.  The consultants' narrative assessments are consistent with their checkbox ratings concerning Aaron's abilities to concentrate, persist, and maintain pace.  Accordingly, the ALJ's RFC finding did not fail to capture the relevant limitations assessed by the consultants regarding concentration, persistence, and maintaining pace.

### Brief Interaction with Supervisors and Coworkers

Aaron also contends that the ALJ's finding that he was limited to occasional interaction with supervisors and coworkers is materially different than the consultants'

narrative assessments that he could tolerate only brief interaction with coworkers and supervisors. Dkt. 20 at 24-25. Aaron's contention relies, in part, on the definition of occasional in SSR 83-10. *Id*. "'Occasionally' means occurring from very little up to one-third of the time." SSR 83-10 (S.S.A. 1983), 1983 WL 31251, at *5.

In *Reynolds v. Kijakazi*, 25 F.4th 470, 473-75 (7th Cir. 2022), the court rejected a virtually identical argument. The court explained that the case was distinguishable from district court opinions based on a consultant's assessment that the claimant was limited to "superficial" interaction with supervisors and coworkers, there was "no such evidence of a qualitative interaction limitation," and the court would not reweigh the evidence "to intuit a qualitative limitation" based on a consultant's assessment that the claimant was limited to "brief" interaction with supervisors and coworkers. *Id*. at 473-74. The court also explained that "[t]he ALJ was not required to impose such a limitation in the RFC, much less explain her decision not to." *Id*. at 474. The court reasoned, in part, that the appellant's use of the definition of occasional in the *Dictionary of Occupational Titles* ("the DOT")—meaning up to one-third of the workday—was "misleading because the DOT definition does not refer to interactions with others; instead, it refers to the frequency with which an employee would have to exert various amounts of physical force," and the appellant had cited "no other support for the notion that the ALJ's RFC would require [him] to interact with supervisors and coworkers for up to two hours and forty minutes per day." *Id*. Aaron relies on SSR 83-10 rather than the DOT, but the context is the same, referring to the amount of time during a workday that a worker

17

would be expected to engage in the exertional demands of an occupation. *See* 1983 WL 31251, at *5.

Here, there is also scant evidence that Aaron had any limitations interacting with others. The ALJ assessed that Aaron's ability to interact with others was no more than mildly limited based on him not raising any interpersonal issues during the application process, denying them when he filled out functional reports for the SSA, reporting that he spent time with others, and his demonstrated ability to interact appropriately with his medical providers. R. at 14. In August 2017, Dr. Achaen recorded that Aaron "had anger and temper issues" but they had "gotten better." R. at 429. The consultants' checkbox ratings did not find any impairment with social interaction, and Aaron's most recent employer did not report any evidence of problems working with others. Accordingly, the ALJ's RFC finding that Aaron could tolerate occasional interaction with supervisors and coworkers is supported by substantial evidence.

## **Conclusion and Order**

For the reasons explained above, the Commissioner's decision is AFFIRMED. Final judgment shall issue by separate order. Fed. R. Civ. P. 58(a).

IT IS SO ORDERED.

Date: 7/12/2022

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Lori M. Craig
KELLER & KELLER
lcraig@2keller.com

Lu Han
SOCIAL SECURITY ADMINISTRATION
lu.han@ssa.gov

Nicholas Thomas Lavella
KELLER & KELLER
nlavella@2keller.com

Matthew Frederick Richter
KELLER & KELLER LLP
mrichter@2keller.com

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov